UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,                      Case No. 16-cr-20193
                                                Hon. Matthew F. Leitman

v.

KEVIN MASSINGILLE,

        Defendant.

_____/

## ORDER GRANTING DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE (ECF No. 28)

Defendant Kevin Massingille is a federal prisoner incarcerated at FCI Morgantown. Massingille is 65 years old, and he suffers from several serious medical conditions, including diabetes and high blood pressure – both of which the Bureau of Prisons (the "BOP") regards as "uncontrolled." On July 1, 2020, Massingille moved for compassionate release under 18 U.S.C. § 3582(c)(1)(A). (*See* Mot. for Compassionate Release, ECF No. 28.) For the reasons explained below, Massingille's motion is **GRANTED**.

## I

### A

On February 9, 2016, Massingille was charged in a criminal complaint with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), and

possessing heroin with intent to distribute, in violation 18 U.S.C. § 841(a). (*See* Crim. Compl., ECF No. 1.)  A federal magistrate judge issued an arrest warrant for Massingille on the same day. (*See* Arrest Warrant, ECF No. 2.)

Massingille appeared in federal court for an initial appearance on February 22, 2016. (*See* Initial Appearance, ECF No. 3.)  He was released on an unsecured bond that day. (*See* Order Setting Conditions of Release, ECF No. 4; Bond, ECF No. 5.)  A federal grand jury later indicted Massingille on the felon in possession and intent to distribute charges on March 17, 2016. (*See* Indictment, ECF No. 9.) Massingille remained on bond for over a year, and during that time he fully complied with all of his conditions of release. (*See* Mot. for Compassionate Release, ECF No. 28, PageID.132.)

On August 23, 2016, pursuant to a Rule 11 Plea Agreement, Massingille pleaded guilty to one count: being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g). (*See* Rule 11 Plea Agreement, ECF No. 17, PageID.53.)  The Government and Massingille agreed that his Sentencing Guidelines range was 84 to 105 months imprisonment. (*See id.*, PageID.55.)  The U.S. Probation Department later calculated Massingille's sentence range as 70 to 87 months imprisonment, and the Government recommended that Massingille be sentenced to 78 months imprisonment. (*See* Gov't Sentencing Memorandum, ECF No. 18, PageID.75.)

On February 2, 2017, this Court sentenced Massingille to 70 months imprisonment – the low end of the Probation Department's calculated sentence range. (*See* Judgment, ECF No. 20, PageID.93–94.)   The Court also sentenced Massingille to 2 years of supervised release after his release from imprisonment. (*See id.*, PageID.95.)

Massingille self-reported to FCI Morgantown to begin serving his sentence on April 22, 2017. (*See* Stip. Order Extending Surrender Date, ECF No. 21; Prisoner Data, ECF No. 28-14, PageID.258.)  Massingille's projected release date is April 11, 2022. (*See* Prisoner Data, ECF No. 28-14, PageID.257.)   He has now served approximately 40 months, or 57%, of his 70-month sentence.

## B

Massingille – who is an Army veteran, husband, father of two, and grandfather of four – has worked to improve himself while in custody.  He has earned his GED while in prison. (*See* Transcript, ECF No. 28-7, PageID.152.)  He has been involved in the Veteran's Re-entry Program and the Stage Forward Group at FCI Morgantown, and he has taken at least 187 hours of classes. (*See id.*)  He has also "spent the majority of his time incarcerated working on the Compound Labor Pool, providing general cleaning as needed." (BOP Progress Report, ECF No. 28-8, PageID.153.)   Massingille has also maintained a clean disciplinary record while incarcerated. (*See* Disciplinary Record, ECF No. 28-12, PageID.255.)

In addition, Massingille has been categorized as having a "low" or "minimum" risk of recidivism under the BOP's PATTERN scoring system.[1] (Pattern Score, ECF No. 28-9, PageID.157.)   Massingille has been referred to the BOP's Elderly Offender Pilot Program, which would allow him to be released on March 12, 2021. (*See* Supervision Release Plan, ECF No. 28-13, PageID.256.)

## C

Massingille has a number of health conditions that put him at risk of severe consequences, including death, if he contracts COVID-19.

First, Massingille has Type II diabetes with diabetic neuropathy. (*See* Medical Records, ECF No. 33, PageID.577.)   Prison medical officials have described Massingille's diabetes as "uncontrolled." (*Id.*, PageID.498.)   His April 2020 hemoglobin A1C reading – a measure of his blood sugar levels – was 8.3%. (*See id.*, PageID.695.)   Since he has been incarcerated, his A1C reading has been as high as 9.9% (*See id.*, PageID.524.)   These readings are substantially higher than the target A1C level of 7% or less for most diabetic adults. *See A1C Test*, Mayo Clinic, https://www.mayoclinic.org/tests-procedures/a1c-test/about/pac-20384643   (last visited Aug. 7, 2020).   Massingille's diabetes is so severe that he has suffered from

---

[1] The PATTERN scoring system was developed by the BOP to measure a prisoner's risk of recidivism. *See Department of Justice Announces Enhancements to the Risk Assessment System and Updates on First Step Act Implementation*, Dep't of Justice (Jan. 15, 2020), https://www.justice.gov/opa/pr/department-justice-announces-enhancements-risk-assessment-system-and-updates-first-step-act.

diabetic neuropathy, a type of nerve damage occurs in individuals with diabetes. (*See* Medical Records, ECF No. 33, PageID.646; *see also Diabetic Neuropathy*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/diabetic-neuropathy/symptoms-causes/syc-20371580#:~:text=Diabetic%20neuropathy%20is%20a%20type,in%20your%20legs%20and%20feet. (last visited Aug. 7, 2020).)

Massingille's diabetes increases his risk of a severe outcome from COVID-19. According to the CDC, "[h]aving type 2 diabetes increases [a person's] risk of severe illness from COVID-19." *Coronavirus Disease 2019 (COVID-19): People With Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html#diabetes (last visited Aug. 7, 2020). The COVID-19 pandemic has also reduced Massingille's ability to provide adequate self-care for his diabetes while incarcerated. Because FCI Morgantown implemented a 24-hour lockdown during the COVID-19 pandemic, Massingille has had "limited access to nutritious food" that can reduce his blood sugar level. (Mot. for Compassionate Release, ECF No. 28, PageID.116.) Massingille says that prisoners at FCI Morgantown "receive only one proper meal at lunch time. At breakfast and dinner time, they receive snack packs, which include items severe diabetics should not eat, like cookies, chips, fruit bars, and frosted flakes. To avoid

a spike in his A1C level, Mr. Massingille has opted to forego eating breakfast most days." (*Id.*)

Second, Massingille suffers from hypertension.  Hypertension is categorized as a systolic (top number) blood pressure reading above 130 or a diastolic (bottom number) reading above 80.  *See Blood Pressure Chart*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/in-depth/ blood-pressure/art-20050982 (last visited Aug. 7, 2020).  On June 10, 2020, Massingille had a blood pressure reading of 171/78. (*See* Medical Records, ECF No. 33, PageID.667.)  His previous reading was 179/79 on May 22, 2020. (*See id.*) Prison medical officials have described Massingille's hypertension as "uncontrolled." (*Id.*, PageID.498.)

Massingille's hypertension also renders him more susceptible to a severe outcome from COVID-19.  According to Dr. Nancy Anoruo, "new research shows that people with high blood pressure may be more likely to be hospitalized and become severely ill with the virus that causes COVID-19." Dr. Nancy M. Anoruo, *Having High Blood Pressure May Make Coronavirus More Dangerous. Here's What You Need to Know*, ABC (June 1, 2020), https://abcnews.go.com/US/high-blood-pressure-make-coronavirus-dangerous/story?id=70991996.  The CDC similarly states that hypertension may increase a person's risk of severe illness from COVID-19. *See Coronavirus Disease 2019 (COVID-19): People With Certain*

6

*Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal= https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html#diabetes (last visited Aug. 7, 2020). And Massingille directs the Court to studies indicating that "high blood pressure is the most common comorbidity for persons admitted to the hospital in the U.S. for COVID-19 treatment." (Mot. for Compassionate Release, ECF No. 28, PageID.118.) Notably, the Secretary of the Department of Health and Human Services has also described the connection between hypertension, diabetes, and severe outcomes from COVID-19. *See* Kristen Holmes & Kevin Bohn, *Azar Lays Part of Blame for COVID-19 Death Toll on State of Americans' Health*, CNN (May 17, 2020), https://www.cnn.com/2020/05/17/politics/us-health-conditions-coronavirus-alex-azar-cnntv/index.html (quoting Health and Human Services Secretary Alex Azar) ("[I]f we have hypertension, if we have diabetes, we present with greater risk of severe complications from corona – from this coronavirus.").

Third, Massingille qualifies as obese. An individual with a body mass index ("BMI") of 30 or higher is categorized as obese. *See About Adult BMI*, CDC, https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/index.html (last visited Aug. 7, 2020). On May 22, 2020, Massingille's BMI was calculated at 34.4, which places him in the "obese" category." (*See* Medical Records, ECF No. 33,

PageID.647.)  According to Dr. Kyle Stephens, a weight-loss surgeon at Houston Methodist Hospital, "Having a BMI of 30 or higher increases a person's risk of developing a severe case of COVID-19 by 27%." Katie McCallum, *Obesity & COVID-19: Can Your Weight Alone Put You At Higher Risk?*, Houston Methodist (July 1, 2020), https://www.houstonmethodist.org/blog/articles/2020/jun/obesity-and-covid-19-can-your-weight-alone-put-you-at-higher-risk/.  The CDC has also noted that "[h]aving obesity, defined as a body mass index (BMI) of 30 or above, increases your risk of severe illness from COVID-19." *See Coronavirus Disease 2019 (COVID-19): People With Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html#diabetes (last visited Aug. 7, 2020).

Finally, Massingille is currently 65 years old. (*See* Mot. for Compassionate Release, ECF No. 28, PageID.109.)  According to the CDC, "[a]s you get older, your risk for severe illness from COVID-19 increases," and "people in their 60s or 70s are, in general, at higher risk for severe illness than people in their 50s." *Coronavirus Disease 2019 (COVID-19): Older Adults*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last visited Aug. 7, 2020).  Massingille has also submitted a declaration

from Dr. Chris Beyrer, Professor of Epidemiology at Johns Hopkins University, stating that aging prisoners such as Massingille "may be vulnerable to more severe illnesses after infection." (Dr. Beyrer Aff. ¶ 16, ECF No. 28-5, PageID.142.)

**D**

As noted above, Massingille is currently in custody at FCI Morgantown.  As of August 7, 2020, at least one staff member at the prison has tested positive for COVID-19. *See COVID-19 Cases*, BOP, https://www.bop.gov/coronavirus/ (last visited Aug. 7, 2020).  Moreover, Monongalia County, where FCI Morgantown is located, has been hit hard by the COVID-19 pandemic and has more confirmed cases than many other West Virginia counties.  More specifically, the county had 918 cases of COVID-19 as of August 7, 2020, and the county continues to report new cases each day. *See COVID-19: Monongalia County Daily Updates*, Monongalia Cnty. Health Dep't, https://www.monchd.org/covid-19.html (last visited Aug. 7, 2020); *COVID-19: Monongalia County Weekly Statistics*, Monongalia Cnty. Health Dep't, https://www.monchd.org/mon-co-covid-19-stats.html (last visited Aug. 7, 2020). The situation in Monongalia County has been so troubling that a health official in Marion County, which neighbors Monongalia County, "strongly" recommended that its residents avoid traveling to Monongalia County. *See* Scott Gillespie, *As COVID-19 Cases Skyrocket, Health Official Recommends Avoiding Monongalia County* (July 17, 2020), https://www.timeswv.com/covid-19/as-covid-19-cases-skyrocket-

health-official-recommends-avoiding-monongalia-county/article_86725064-c7ad-11ea-8d43-afc6599e7141.html.  Despite the rising number of COVID-19 cases in the county, only 45 of FCI Morgantown's 488 prisoners have been tested for the virus.  *See   COVID-19   Inmate   Test   Information*,   BOP, https://www.bop.gov/coronavirus/ (last visited Aug. 7, 2020); *FCI Morgantown*, BOP, https://www.bop.gov/locations/institutions/mrg/ (last visited Aug. 7, 2020).

## E

Massingille petitioned the warden of FCI Morgantown for compassionate release on May 25, 2020. (*See* Request for Compassionate Release, ECF No. 28-2, PageID.137.)  His request was denied on June 8, 2020. (*See* Denial Letter, ECF No. 28-4, PageID.139.)

## F

Massingille now moves for compassionate release. (*See* Mot. for Compassionate Release, ECF No. 28.)  He argues that his increased susceptibility to a severe outcome from COVID-19, in combination with his inability to provide adequate self-care by social distancing or practicing CDC-recommended hygiene practices while incarcerated at FCI Morgantown, is an extraordinary and compelling reason that warrants his release. (*See id.*, PageID.113–127.)  The Government opposes Massingille's motion. (*See* Resp., ECF No. 34.)

In Massingille's motion, he highlights that he has a support system and a plan in place for re-entering the community upon his release.  His wife, children, and grandchildren live in Detroit,  and he maintains regular contact with them. (*See* Mot. for Compassionate Release, ECF No. 28, PageID.127; *see also* Letters of Support, ECF No. 28-6, PageID.144–151.)  Upon release, he plans to live with his wife and to seek support from his family members.  Massingille also has specialized skills in masonry, and he hopes "to return to a masonry business he ran with his son." (Mot. for Compassionate Release, ECF No. 28, PageID.127–128.)  Moreover, upon his release, Massingille plans to reestablish contact with Veteran Affairs to seek assistance to receive his pension and health care. (*See id.*, PageID.128.)  And Massingille will also be eligible to receive Social Security benefits after he is released. (*See id.*)

The Court held an on-the-record video hearing on Massingille's motion on July 17, 2020.  On July 29, 2020, Massingille's counsel filed a supplemental brief to his motion, informing the Court that a staff member at FCI Morgantown had tested positive for COVID-19. (*See* Supp. Br., ECF No. 38, PageID.772.)

## II

Section  3582(c)(1)(A) describes when  a  court  may  grant  a  prisoner compassionate release:

> [T]he court . . . may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

§ 3582(c)(1)(A).

The "applicable policy statements" mentioned in the statute are found in U.S.S.G. § 1B1.13. The comment to that section identifies the reasons for release that may rise to the level of "extraordinary and compelling":

> <u>Extraordinary and Compelling Reasons</u>.— Provided the defendant meets the requirements of subdivision (2), extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
> (A)    <u>Medical Condition of the Defendant</u>.—
>
> (i)    The defendant is suffering from a terminal illness (<u>i.e.</u>, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (<u>i.e.</u>, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(ii)     The defendant is—

> (I)     suffering from a serious physical or medical condition,

> (II)    suffering from a serious functional or cognitive impairment, or

> (III)   experiencing deteriorating physical or mental health because of the aging process,

> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B)     <u>Age of the Defendant</u>.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C)     <u>Family Circumstances</u>.

> (i)     The death or incapacitation of the caregiver of the defendant's minor child or minor children.

> (ii)    The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D)     Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

One district court has offered the following helpful explanation concerning how to apply the compassionate release statute in conjunction with the Sentencing Commission's guidance:

> [P]ursuant to the statutory directive in 18 U.S.C. § 3582(c)(1)(A) and in conjunction with the Sentencing Commission guidance provided in U.S.S.G. § 1B1.13, the Court must consider three issues in evaluating [a federal prisoner's] Compassionate Release application: (i) whether extraordinary and compelling reasons warrant a sentence reduction consistent with the Sentencing Commission's policy statement, (ii) whether [the prisoner] is "a danger to the safety of any other person or to the community," and (iii) whether the section 3553(a) factors "to the extent they are applicable," weigh in favor of a sentence reduction. *United States v. Bellamy*, 2019 WL 3340699, at *2 (D. Minn. July 25, 2019); [*United States v.*] *York*, 2019 3241166, at *5 [E.D. Tenn. July 18, 2019]; *United States v. Beck*, 2019 WL 2716505, at *7 (D.N.C. June 28, 2019); *United States v. Johns*, 2019 WL 2646663, at *3-4 (D. Ariz. June 27, 2019); [*United States v.*] *McGraw*, 2019 WL 2059488, at *3 [S.D. Ind. May 9, 2019].

*United States v. Wong Chi Fai*, No. 93-cr-1340, 2019 WL 3428504, at *2 (E.D.N.Y. July 30, 2019).

# III

## A

The Court finds that the combination of (1) Massingille's heightened susceptibility to a severe outcome from COVID-19, (2) Massingille's inability to practice self-care and to follow CDC guidelines while in custody, and (3) the outbreak of COVID-19 in the community surrounding FCI Morgantown, amount to extraordinary and compelling reasons that support Massingille's compassionate release.

First, Massingille's heightened risk of severe complications (or death) from COVID-19 supports a finding of extraordinary and compelling circumstances. As described above, the combination of Massingille's diabetes, hypertension, obesity, and age places him at increased risk of a severe outcome (including death) from the virus. Indeed, this Court and several other district courts have found that Massingille's serious medical conditions amount to extraordinary and compelling circumstances during the COVID-19 pandemic. *See, e.g.*, *United States v. Rountree*, --- F. Supp. 3d ---, 2020 WL 2610923, at *7 (N.D.N.Y. May 18, 2020) ("Rountree's diabetes and hypertension place him at high risk for developing a severe case of COVID-19, and therefore support his request for compassionate release."); *United States v. Reddy*, No. 13-CR-20358, 2020 WL 2320093, at *7 (E.D. Mich. May 11, 2020) ("And the combination of Reddy's other conditions – including Type II

diabetes and hypertension – substantially increases her risk of dire medical consequences and/or death if she contracts COVID-19."); *United States v. Zukerman*, --- F. Supp. 3d ---, 2020 WL 1659880, at *5 (S.D.N.Y. Apr. 3, 2020) ("Zukerman's age, combined with his diabetes, hypertension, and obesity, satisfy [the extraordinary and compelling circumstances] requirement.").  Moreover, Massingille's inability to provide adequate self-care – both for his blood sugar levels while FCI Morgantown remains on lockdown and to practice social distancing and CDC-recommended hygiene practices while incarcerated – further weigh in favor of release. *See United States v. Colvin*, --- F. Supp. 3d ---, 2020 WL 1613943, at *4 (D. Conn. Apr. 2, 2020) ("Defendant is unable to provide self-care within the environment of FDC Philadelphia in light of the ongoing and growing COVID-19 pandemic because she is unable to practice effective social distancing and hygiene to minimize her risk of exposure . . . ." (quotation marks omitted)).

Second, although there has not yet been a recorded positive case of COVID-19 among FCI Morgantown's prisoners, there appears to be a meaningful risk that – despite the BOP's best efforts – the virus will enter the prison, and that further supports a finding of extraordinary and compelling circumstances.  Indeed, the number of cases in Monongalia County is on the rise, and FCI Morgantown has recently had at least one staff member test positive.  Given that the staff of FCI Morgantown must necessarily circulate in a community that has been hit hard by the

virus, there is an appreciable risk that additional staff will become infected and will transmit the virus to the prisoners.

In sum, Massingille's increased susceptibility to COVID-19, his inability to provide adequate self-care, and the risk that the virus might spread to FCI Morgantown from the surrounding community – taken together – amount to extraordinary and compelling circumstances that support Massingille's compassionate release.

## B

For the reasons explained below (in the context of the Court's discussion of the Section 3553(a) factors), the Court concludes that releasing Massingille would not pose a danger to the safety of the community or any of its members.

## C

The Court finds that releasing Massingille would be consistent with the factors listed in 18 U.S.C. § 3553(a).

The nature and circumstances of Massingille's offense are undoubtedly serious. *See* § 3553(a)(1). Thus, this one factor may weigh against granting compassionate release. But the remaining Section 3553(a) factors weigh in favor of compassionate release.

Massingille's personal history and characteristics support release. One of Massingille's most relevant personal characteristics is his vulnerability to COVID-

19 due to his medical conditions, and that vulnerability strongly supports release now. And Massingille's efforts to improve himself and be a contributing member to his environment – including taking courses and holding a steady job while incarcerated – also demonstrate positive developments in Massingille's character. The Court is mindful that Massingille's criminal history includes several drug-related offenses, and that history weighs against release. But the Court concludes that Massingille's more recent history during his incarceration and his other personal characteristics outweigh the negative influence of his criminal history.

Likewise, the goal of imposing sufficient punishment would be satisfied by releasing Massingille. *See* § 3553(a)(2)(A). Massingille has served over 57% of his sentence. He has already suffered meaningful and substantial punishment for his crimes. Moreover, the BOP itself, by referring him to its Elderly Offender Pilot Program and a chance at an early release, has indicated that it believes Massingille has nearly served a sufficient punishment for his offense. Further, Massingille will suffer additional restrictions on his liberty through the home confinement condition that the Court will impose. Massingille's time served plus the continued restrictions on his freedom of movement from the home confinement condition imposed by the Court, together, satisfy the goal of imposing sufficient punishment.

In addition, releasing Massingille is consistent with the goal of deterrence. Massingille has served a not insubstantial sentence in prison, and that lengthy period

of custody is also long enough to achieve both general and specific deterrence. Moreover, the Court is impressed by Massingille's re-entry plan and by the economic support that is available to him upon release (including pension funds). The family and financial support that will be available to Massingille upon release substantially diminish the risk of him re-offending and render additional time in custody unnecessary to achieve specific deterrence.

Next, releasing Massingille to home confinement will not subject the public to a serious risk of harm. *See* § 3553(a)(2)(C). Indeed, Massingille's PATTERN score alert indicates that the BOP itself has concluded that he is at a low risk of recidivating. Massingille's exemplary conduct while out on bond and clean disciplinary record while incarcerated further suggest that it is unlikely that he will reoffend.

Furthermore, the most effective way to deliver medical care to Massingille is outside of FCI Morgantown where he can receive needed monitoring and treatment of his diabetes, hypertension, and obesity without facing an immediate threat of COVID-19. *See* § 3553(a)(2)(D). In particular, given FCI Morgantown's inability to provide Massingille with proper meals for his blood sugar levels while on lockdown, Massingille should be able to better address his nutrition needs outside of custody.

Finally, Massingille's release will not produce an unwarranted sentencing disparity because it accounts for his unique medical circumstances. *See* § 3553(a)(6).

**IV**

Accordingly, for the reasons explained above, **IT IS HEREBY ORDERED** that Massingille's Motion for Compassionate Release (ECF No. 28) is **GRANTED**.

The custodial portion of Massingille's sentence is reduced to time served. He shall immediately be released from custody. Upon his release, Massingille shall travel directly by automobile from FCI Morgantown to the home that he owns with his wife. Massingille and all others with him in the automobile shall wear face masks during the drive. After Massingille arrives at his home, he shall remain inside the house for fourteen days. And for the same 14-day period, he shall quarantine within the house – meaning he shall remain in a room that is separate and apart from all other residents of the house to the extent possible. And when, during the 14-day quarantine period, it is unavoidable for him to be in a separate room, he shall wear a face mask.

Also, upon Massingille's release from custody, Massingille shall begin serving the 2 years of supervised release that the Court imposed in Massingille's Judgment. (*See* Judgment, ECF No. 20, PageID.95.) The Court adds as a condition of that supervised release that Massingille shall be subject to home confinement at his residence for six months and, during that period of home confinement, shall not

leave that residence other than for employment, job training, religious services, medical and/or mental health appointments, treatment programs, appointments with counsel, and/or other activities approved in advance by his supervising probation officer.  (He may not leave the residence at all during the 14-day quarantine period.)

The Court will not order Massingille to wear a GPS tether at this time due to the COVID-19 pandemic (and the Court's reluctance to subject the Court's probation officers to any risks associated with applying Massingille's tether), but the Court will hold a telephonic status conference with counsel in sixty days to discuss whether to require Massingille to wear a tether at that time.  In all other respects, Massingille's original sentence remains unchanged.

**IT IS SO ORDERED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  August 7, 2020

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on August 7, 2020, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(810) 341-9761